■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ISRAEL VASQUEZ, Appellant. [841 NYS2d 261]—

Judgment, Supreme Court, Bronx County (William C. Donnino, J.), rendered May 8, 1997, convicting defendant, after a jury trial, of two counts of murder in the second degree, and sentencing him to concurrent terms of 25 years to life, unanimously reversed, on the law, the convictions vacated and the indictment dismissed. Appeal from order, same court (Michael R. Sonberg, J.), entered June 5, 2006, which, to the extent appealable, denied defendant's motion pursuant to CPL 440.30 (1-a) for DNA testing, unanimously dismissed as academic.

Defendant was indicted and jointly tried with three other defendants, Devon Ayers, Michael Cosme and Carlos Perez, for the murder of Denise Raymond in her apartment on January 17, 1995 and the murder two days later of Bathie Diop, a livery cab driver who was found robbed and shot to death in his town car. The only evidence allegedly linking defendant to the Diop killing was the testimony of an acquaintance that she saw someone who resembled defendant take something from around the victim's neck after he was shot. The jury acquitted defendant of that crime.

The People's theory was that both murders were the result of a conspiracy hatched at a meeting in the home of defendant's cousin and codefendant, Cosme, earlier on the day of the first murder, and that Ms. Raymond's murder was a contract killing carried out at the behest of her former boyfriend, Charles McKinnon, who was tried separately and acquitted.

With regard to Ms. Raymond's murder, the prosecution, in its opening remarks to the jury, described a loosely organized group of black and Hispanic young men called the Nates, of which the four defendants were allegedly members. As relevant to defendant, the jury was told the evidence would establish that as Ms.

Raymond arrived home after work on the evening of January 17, 1995 and put her key in the door of her apartment, she was rushed from behind by Ayers, who was known in the neighborhood as Skloo, and defendant, who was known as Izzy. According to the prosecutor, Skloo punched her in the face, and defendant, who had brought a roll of duct tape with him, wrapped the tape around her face to prevent her from crying out. The two then allegedly dragged Ms. Raymond to the bedroom where they handcuffed her. The jurors were also told they would learn that the four men spent some time in the apartment, ate from her refrigerator and drank some juice while they went about their work of terrorizing her into divulging her bank card PIN and then putting a pillow over her face and shooting her twice in the head.

Notwithstanding the prosecution's opening remarks outlining its promised case against defendant, the only evidence offered by the People at trial even remotely linking defendant to that crime was the testimony of an 18-year-old witness (she was 16 at the time of the crime). She testified that, sometime on the day of Raymond's murder, she went to Cosme's house to get her brother's cellular phone and, while she was there, she overheard Skloo, Cosme and a "Jamaican guy" whom she did not know, none of whom mentioned defendant, talking about robbing a taxi and a girl. The Jamaican guy was doing all the talking. She further testified that at some point, Perez came to the house looking for his daughter and spoke briefly to Cosme. Again, there was no mention of defendant.

The next day, January 18, after Ms. Raymond did not arrive at work, the police went to her apartment sometime after 1:00 P.M. and found her dead on her bedroom floor. She had been shot twice in the head and was handcuffed and blindfolded with duct tape placed over her mouth. Most significant to the People's case against defendant, the police found the refrigerator door ajar with an empty lunch meat wrapper inside. The sink contained an empty Tropicana juice carton and a plastic mustard dispenser. Sixteen fingerprints were obtained in and around Ms. Raymond's apartment, including one from the juice carton; however, while three prints belonged to Ms. Raymond, none of them matched fingerprints of defendant or his alleged accomplices. There was forensic testimony that suggested the murderers either wore gloves or wiped fingerprints off various items in the apartment.

At some unspecified time the same day that Ms. Raymond's body was found and a day before the Diop murder, the previously mentioned witness testified that she went to a neighbor-

hood park with two girlfriends and, at some point, overheard defendant talking about "drinking juice and having a sandwich." However, the witness's testimony was at best equivocal.

When asked on direct examination whether the four defendants were in the park, she stated: "They always be in the park, they like to hang around in the park." She testified that they were talking to each other, but not to her. When asked if she was "hearing what they were saying to each other," she replied: "Yeah, because it was a lot of people in the park." When asked to be specific as to what she heard Skloo say, she testified that Skloo

"liked to play a lot. He was talking about a lot of things.

"Q. Go ahead?

"A. But, they was talking about somebody was reading the newspaper and they was talking. Right there, it's the thing about the murder of the girl.

"Q. Okay?

"A. But they was, they was talking about that only."

She then testified that Skloo said he "knock[ed] on the door" and "punched the lady out." Skloo also talked about handcuffs and Cosme, according to the witness, was overheard saying that he "just stay in the hallway."

"Q. Okay. How about Izzy, did he talk about what he did to the lady?

"A. The only thing I know is that they were drinking juice and sandwiches.

"Q. Someone talked about drinking juice and having a sandwich?

"A. Yes.

"Q. Who talked about that?

"A. Izzy.

"Q. Did he tell you, if you remember what kind of juice?

"A. No."

The witness then testified that Perez said nothing in the park.

On cross-examination, however, the witness admitted that she could not recall who was in the park on the day of the conversation besides herself, a girlfriend, and a lot of other people, whether or not the statement about the juice and sandwich was actually made, and who might actually have said it. The witness also testified on cross-examination that two weeks after the crime, she told Detective Donnelly "that I don't know anything about this case." Detective Donnelly, who

investigated Ms. Raymond's murder, had also testified that after Cosme was arrested two weeks later on February 3, 1995, defendant visited him in an interview room and brought him food and cigarettes.

Because of her contradictory testimony on cross-examination, the court declared the witness hostile and allowed the People to use her grand jury testimony to impeach her trial testimony. Nevertheless, the witness insisted that she could neither remember her grand jury testimony nor who, if anyone, said anything about "drinking juice and having a sandwich."

During the prosecution's summation, the only reference to defendant was during its discussion of the Diop murder, when the prosecutor stated: "And, of course we heard about Izzy at the scene. Jurors, what you have here are two obviously planned and premeditated murders. I say obviously, because you know it from the facts, planned in Mike Cosme's house. The same Mike who admits shooting the cabby. The same Mike for whom Izzy shows up at the precinct, saying I'm his cousin, just want to know what's up. That's the same Izzy who, during Denise Raymond's murder, is snacking in her kitchen. So when [the witness in the Diop killing] says it's totally Izzy from behind, it looks like Izzy from the side, it was Izzy, you know what you can find jurors? It was Izzy." As previously noted, the jury acquitted defendant of any participation in the Diop murder.

With respect to Ms. Raymond's murder, the only mention made of defendant was when the prosecutor urged the jury to find the witness's testimony credible and corroborated by physical evidence at the scene of the crime, namely: "How did [the witness] know? . . . They used handcuffs. How did she know? They drank—not they, sorry—Izzy drank juice and ate a sandwich. What's in the sink? Juice container, G[u]lden's mustard jar. And what do we know, that you can't even see? An empty bologna pack in the refrigerator. How did she know? She knew what was there, the juice. She knew what wasn't there, the VCR."

The People argue on appeal that "[n]ot only did defendant admit his participation during a group conversation where the murderers bragged of their misdeed, but he also visited his cousin Cosme at a police precinct, where he had been taken after his arrest. Under all the circumstances, there is no reasonable explanation for defendant's conduct other than he knowingly and intentionally took part in this well-planned murder and robbery." As defendant points out, however, his visit to his cousin at the police precinct does not necessarily support a finding of guilt. To the contrary, if defendant had participated in the

crime and then learned that Cosme had been arrested, it would be much more likely that he would have stayed away from the police, fearing that he might have been linked to the crime or arrested as well.

Just as the case against defendant was flawed, the People's theory is based on speculation unsupported by any credible evidence. There was no evidence adduced at trial to connect defendant to either the so-called conspiracy to commit the alleged contract killing of Denise Raymond or the supposedly related and similarly planned murder of Bathie Diop two days later, other than the circumstance that both murders were committed in his neighborhood; that he hung out with his codefendants in a neighborhood park where everyone was talking about the recent murder in the neighborhood; that he may or may not have talked about "drinking juice and having a sandwich" at or about the same time that two of his codefendants, who were definitely placed at the so-called planning meeting in Cosme's house on the day of the crime, made inculpatory statements; and that he visited his cousin in the police precinct after the latter's arrest.

Accordingly, given the insufficiency of the circumstantial evidence and the inconsistent and contradictory testimony of the witness at issue, even viewing such testimony and comments in the light most favorable to the People and despite the great deference to be accorded to a jury's credibility determinations, there is simply nothing that could lead a rational trier of fact to conclude that defendant was proven guilty beyond a reasonable doubt of this allegedly "well-planned" contract murder.

In light of our reversal, defendant's appeal from the denial of his motion pursuant to CPL 440.30 (1-a) for an order directing DNA testing of hair samples recovered from the crime scene is dismissed as academic. The denial of defendant's request for postconviction reanalysis of certain fingerprints is not appealable (*see People v Stevens*, 91 NY2d 270, 277 [1998]). In any event, were we to reach the merits, we would affirm. Concur—Andrias, J.P., Saxe, Williams, Gonzalez and Kavanagh, JJ.